## SNYPP v STATE

Ohio Appeals, 2nd Dist, Greene Co

No 410.   Decided Jan 15, 1936

Kelly & Knee, Dayton, for plaintiff in error.

Marcus E. McCallister, Prosecuting Attorney, Xenia, for defendant in error.

## OPINION

### By THE COURT

In this error proceeding from the Common Pleas Court the plaintiff in error, who was defendant below, seeks to reverse a judgment pronounced by the court after a verdict of guilty had been returned by the jury. The indictment returned against the defendant below contained four counts. By order of the court trial was had upon the first two counts only of said indictment and the plaintiff in error was found guilty on each of said counts by the jury. A motion for new trial was filed and overruled.

In the first count of the indictment it was charged in substance that the defendant on February 26, 1931 did sell certain securities, to-wit, nine certificates of membership of the International Corporation of Harper Heirs, an Ohio Corporation, to Mr. and Mrs. Charles Buck for the sum of Fifty Dollars each, without being then and there licensed so to do by the Division of Securities of the State of Ohio.

The second count of the indictment charged in substance that the defendant did knowingly and intentionally sell the securities set forth in the first count to Mr. and Mrs. Charles Buck, said securities not having been registered or qualified under the said Securities Act and not being exempt from registration or qualification as therein provided.

The evidence discloses that the International Corporation of Harper Heirs was a corporation not for profit, organized under the laws of the State of Ohio on July 7, 1928; that it was organized, according to the articles of incorporation, for the purpose of discovering, securing in tangible form

and tabulating information and evidence concerning the lineage and estates of various persons named Harper, for the purpose of interchanging information, evidence opinions and suggestions among the heirs and descendants of said persons relative to such lineage and estates, for the purpose of compiling in concrete form all information, evidence, records and documents pertaining to the said Harper lineage and estates in order that such information, evidence, records and documents may be of more practical use to said heirs and descendants, and for the purpose of doing all other things necessary and incidental thereto; that certificates of membership in said corporation were issued under the names of the president and secretary thereof and were sold to various persons; that McClain Catterlin was selected president of said corporation on February 24, 1930 and continued as such until the year 1932; that John A. McClain was secretary of said corporation from February 24, 1930 until his resignation, dated February 5, 1931, was accepted on February 8, 1932; that the defendant, Francis Snypp, was employed by said corporation in January, 1931, for the purpose of running the blood lines and assisting in the establishment of the lineage of the Harper Heirs at a monthly salary of $150.00 plus traveling expenses of $100.00 monthly; that the said defendant was not a certificate holder in said corporation; that on February 26, 1931, in the morning, Mrs. Charles Buck called Fred McClain, who was the son of John McClain, by telephone and told him that she desired to purchase ten certificates in said corporation; that Fred McClain told her over the telephone that he had but nine certificates; that thereupon Mrs. Buck directed him to hold said certificates for her and stated that she would come after them in the afternoon of the same day; that she went to the home of Fred McClain in the afternoon of February 26, 1931 and upon arrival there found present McClain Catterlin and the defendant, together with Mr. and Mrs. Fred McClain; that no conversation passed between those persons present concerning the purchase of said nine certificates of membership which had been arranged by telephone; that the parties were in the same room; that Mrs. Buck, Fred McClain and the defendant were seated at or near a table in said room; that Fred McClain opened a drawer in the table and drew out nine certificates which were already signed by McClain Catterlin as president and John A. McClain, secretary; that said certificates were not dated nor was the name of

the owner contained therein; that Fred Mc-Clain asked the defendant to insert the date and the name of Mr. and Mrs. Charles Buck in said certificate; that the defendant did so; that while defendant made these insertions Fred McClain filled out an application for the purchase of said certificates and had Mrs. Buck sign the same; that thereupon Mrs. Buck counted out on the corner of the table the sum of $450.00 in payment for said certificates; that Fred McClain gave to defendant some additional money which he had taken in from the sale of certificates and defendant took the $450.00 which Mrs. Buck had laid on the table for the purpose of depositing the total amount in the bank; that at no time during the transaction at the Fred McClain home did the defendant make any statement to Mrs. Buck concerning the purchase or sale of these certificates; that the defendant did make other sales of certificates of membership in said corporation at later dates; that McClain Catterlin had been indicted by the Grand Jury for the same offense and had been found guilty on each of the two counts in said indictment.

McClain Catterlin was called as a witness on behalf of the State and testified that he and the defendant had returned from a trip to Virginia on February 26, 1931, having reached Dayton, Ohio, about eight or eight-thirty in the morning; that they had driven by automobile to Osborn and after a short stop at Osborn had gone on to the home of Fred McClain, which is about three and one-half miles west of Xenia; that the defendant had told him that it was necessary for them to go there to see Fred McClain and Mrs. Buck. Both Mrs. Buck and Fred McClain state that they had imparted to no one the expressed intention of Mrs. Buck to purchase these nine certificates. There is other evidence in the record which leads us to believe that McClain Catterlin was highly interested in the conviction of this defendant. The evidence of all the witnesses indicates that no one knew of the desire on the part of Mrs. Buck to purchase these nine certificates, except her husband and Fred McClain. The evidence also shows that no application had been filed to qualify or register these corporation certificates with the Securities Division and that no application for a license to sell had ever been filed by the defendant.

Counsel for the defendant contend that certificates of this corporation are exempt from registration and qualification under the State Securities Act. An examination of the court's charge discloses that the court submitted to the jury the various sections of the Securities Act which have to do with exemption privileges and that the court advised the jury that it should determine from all of the evidence whether or not the corporation might have earnings and whether or not such earnings would inure to the benefit of the various certificate holders. The charge of the court in this particular was quite similar to that given to the jury in the case of **The State of Ohio v McClain Catterlin.** That case was brought to this court and the opinion will be found in **16 Ohio Law Abstract, page 410.** In that case the court held that:

"The jury had the right, upon a fair consideration of all the evidence, to conclude that these certificates were sold and purchased with the purpose that they would in the event of the establishment of heirship to the Harper estates, have earnings which would inure to the benefit of shareholders of the corporation."

So, in this case the court is of opinion that the question of exemption from registration with the State Securities Division was properly submitted to the jury and that under the evidence and the law as given by the court the jury had the right to find that these certificates should have been registered and qualified prior to sale.

Counsel for plaintiff in error also contend that under the definitions of "dealer" and "salesman," as found in §8624-2 GC, it was unnecessary for this defendant to have become licensed in order to sell these securities. This section is, in part, as follows:

'SUBDIVISION 6. Salesman shall mean and include every person (other than a dealer) employed, authorized or appointed by a dealer, to sell securities, in any manner within this State. The general partners of a partnership and the Executive Officers of a Corporation or unincorporated Organization or association **licensed as a dealer** shall not be salesmen within the meaning of this definition, nor shall such clerical or other employees of an issuer or dealer as are employed for work to which the sale of securities is secondary and incidental; * * *" (Emphasis ours).

The evidence in this case shows that the corporation was not licensed as a dealer. Therefore, the exception as applied to clerical or other employees could not apply. If the corporation had been licensed as a dealer and this defendant, who had been

employed to trace blood lines, sold some certificates as an incident to his employment he would not be required to secure a license as a salesman. However, when it is found that the corporation by which he is employed is disposing of unregistered certificates as an unlicensed dealer, any employee is amenable to the Securities Act if he himself makes a sale of certificates. §§624-17 GC says that "no person shall sell any securities within this State unless licensed by the Division of Securities," except in certain instances. These exceptions do not apply to this defendant.

Counsel for the plaintiff in error also contend that the State failed to prove by evidence beyond a reasonable doubt that the defendant did make a sale of these nine certificates to Mrs. Charles Buck. §8624-2 GC gives the following definition:

"'Sale' shall have the full meaning of the term 'sale' as applied by or accepted in courts of law or equity, and shall include every disposition, assignment, subscription, offer to sell, option to sell, solicitation or agreement to sell or exchange any security or an interest therein, directly or indirectly by agent, circular, pamphlet, advertisement or otherwise. The term 'sell' shall mean any act by which a sale is made."

In ordinary language a sale is an agreement whereby one person, called the sellor, transfers property to another, called the buyer, for a consideration, called the price. Does this evidence prove beyond a reasonable doubt that the plaintiff in error agreed to transfer to Mrs. Charles Buck nine certificates of membership in this corporation for the sum of $450.00? To put it another way, does this evidence establish by the required degree of proof that Francis Snypp did or performed any act by which a sale of these nine certificates was made to Mrs. Buck? The only physical acts performed by the plaintiff in error were the filling out of the names in the certificates and the picking up of the money from the table. According to the evidence nothing whatever was said by the defendant concerning this sale or purchase. We do not believe that the mere filling out of these certificates in the names of Mr. and Mrs. Charles Buck and the dating of the same at the request of Fred McClain is the making of a sale of these certificates. It was a mere clerical act which might have been performed by anyone, the performance of which surely would not be an act in consummation of the sale of these certificates

We do not believe that great importance may be attached to the fact that the defendant picked up this money from the table, whether voluntarily or at the request of some other person. When the money had been laid on the table and the certificates had been passed over to Mrs. Buck the sale was consummated and completed. The fact that under the circumstances above set forth this defendant took the money, he not being the owner of the certificates which were sold and not having been employed by the corporation to sell the certificates is not proof beyond a reasonable doubt that he made the sale. We are of opinion that this evidence does not establish that the defendant below did anything in this transaction which may be construed by the court to indicate that he made a sale of these certificates, or that he did anything which might be included in the definition of the term "sale" as contained in §8624-2 GC, supra. Evidence of other sales which were made by the defendant was admitted. This evidence is competent under the provisions of §13444-19 GC for the purpose of establishing motive or intent or the absence of a mistake on his part. However, such evidence may not be accepted as probative of the charge set forth in the indictment unless the substance of the crime charged is proven by the State.

Since the State failed to prove a sale, as alleged in the two counts set forth in the indictment, evidence of other sales by this defendant could be of no aid or assistance to the jury in determining his guilt. In its charge to the jury the lower court spoke as follows:

"The Statute provides that the term 'sell' shall mean any act by which a 'sale' is made, and if the State has established beyond a reasonable doubt that the defendant in this case did fill out the certificates and did receive the money for said certificates, that act would, under the terms of the Securities Act, constitute a sale of the security as specified in the indictment."

In view of what has hereinbefore been said the court is of opinion that the trial court erred in the giving of this portion of the general charge. In giving this portion of the charge the court left nothing for the determination of the jury. The uncontradicted evidence showed that the defendant had filled out these certificates and that he had taken the money for the same. In view of this charge the jury was not permitted to say whether or not a sale had been made. The question was determined

by the court as a matter of law by the giving of this part of the charge. This was prejudicial error. We have carefully read the testimony of various witnesses who testified that they heard the defendant make speeches concerning these alleged estates. While there is some conflict in the testimony, we are of opinion that there is no proof beyond a reasonable doubt that the defendant endeavored in these speeches to promote the sale of securities. Apparently, he was advising those persons who were interested relative to the tracing of their blood lines. Our consideration of this evidence does not lead us to the conclusion that the defendant was an aider and abettor, and as such amenable to prosecution as a principal for the sale of these securities.

The court has not had before it for disposition the question of the existence or non-existence of these so-called ancient estates. The sole question to be determined is whether or not the defendant sold certificates of membership. This decision, therefore, disposes of that question alone and the court does not in any wise attempt to pass upon the question of the existence of these estates or claimed rights of heirs.

The court has reached the conclusion that there was no evidence presented which would warrant the conviction of the defendant on either the first or second counts of this indictment. Therefore, it is not necessary to discuss other assignments of error urged by counsel for defendant.

The trial court should have sustained the defendant's motion for a directed verdict made at the conclusion of the State's case. This cause is therefore reversed. The court coming now to enter the judgment which should have been rendered below, orders that defendant be discharged, insofar as the first and second counts of this indictment are concerned. Exceptions.

BARNES, PJ, HORNBECK and BODEY, JJ, concur.